182 Cal.App.4th 87 (2010)
104 Cal.Rptr.3d 790
MARIA PELLEGRINO et al., Plaintiffs and Respondents,
v.
ROBERT HALF INTERNATIONAL, INC., Defendant and Appellant.
No. G039985.
Court of Appeals of California, Fourth District, Division Three.
January 28, 2010.
As modified February 25, 2010.
*91 Seyfarth Shaw, Gilmore F. Diekmann, Jr., Raymond R. Kepner, Todd C. Hunt and Michael D. Mandel for Defendant and Appellant.
Shanberg Stafford, Ross E. Shanberg, Shane C. Stafford; Quest Law Firm and Robert C. Robinson for Plaintiffs and Respondents.

OPINION
FYBEL, J.

INTRODUCTION
Plaintiffs Maria Pellegrino, Nadia Balici, Carolyn Cox, Kelli Maresch, Jennifer McCasland, and James Rossetto (collectively, plaintiffs) sued their former employer, temporary staffing firm Robert Half International, Inc. (RHI), for RHI's alleged failure to comply with Labor Code provisions pertaining to overtime compensation, commissions, meal periods, and itemized wage statements. Plaintiffs also alleged unfair competition claims, under Business and Professions Code section 17200 et seq., which were based on the same alleged Labor Code violations.
RHI asserted two affirmative defenses to plaintiffs' claims. First, RHI contended plaintiffs' claims were barred because a provision, entitled "Limitation on Claims," in their employment agreements shortened the statute of *92 limitations for such claims to six months. Second, RHI argued each plaintiff was exempt from the wage and hour laws based on the administrative exemption.
The trial court determined the limitation on claims provision contained in the employment agreements was unenforceable and granted motions for summary adjudication on that issue accordingly. Plaintiffs' unfair competition claims were tried to the court sitting in equity and began with a trial on the merit of RHI's exemption affirmative defense. The trial court granted plaintiffs' motion for judgment under section 631.8 of the Code of Civil Procedure, having concluded the administrative exemption did not apply to plaintiffs. The parties stipulated as to the amount of damages, penalties, and interest to be awarded each plaintiff; the court entered judgment accordingly.
We affirm. First, the wage and hour laws underlying all of plaintiffs' claims protect unwaivable statutory rights that are supported by strong public policy. The trial court correctly concluded the provision shortening the limitation period violates public policy and is therefore unenforceable.
Second, as authorized by Evidence Code section 320 and Raedeke v. Gibraltar Sav. & Loan Assn. (1974) 10 Cal.3d 665 [111 Cal.Rptr. 693, 517 P.2d 1157], the trial court set the order of proof for trial by having the equitable issues tried first to the bench, to be followed by a trial of the legal issues to the jury, to the extent any outstanding issues remained after resolution of the equitable claims. After the court decided that RHI's exemption affirmative defense was without merit and before the remaining equitable issues were resolved by the court, the parties stipulated to all outstanding issuesboth equitable and legaland judgment was entered accordingly. We find no error.
Finally, the trial court did not err by granting plaintiffs' motion for judgment as to RHI's exemption affirmative defense. Substantial evidence showed plaintiffs' duties and responsibilities did not involve work directly related to management policies or general business operations of RHI or RHI's customers, within the meaning of Industrial Welfare Commission wage order No. 4-2001 (IWC Wage Order No. 4-2001), which is set forth in title 8, section 11040 of the California Code of Regulations and applies in this case.

FACTS[1]
RHI is a staffing company that places temporary employees or "candidates" with its clients. RHI's headquarters in Pleasanton, California, houses, inter alia, its corporate human resources, marketing, and legal departments.
*93 RHI has several divisions which include (1) the Robert Half management resources division which places temporary employees to provide high-level accounting and finance-related services; (2) the Robert Half legal division which places attorneys, paralegals, legal support specialists, and law firm administrators; (3) the creative group division which places temporary employees to provide creative, Web site development, marketing, and advertising services; and (4) the office team division which places administrative staff.
Pellegrino worked for RHI as an account executive in the Robert Half legal division from August 2004 until April 2006. Balici worked for RHI as an account executive in its legal division from September 2004 until May 2005. Cox worked for RHI in its management resources division as an account executive. She worked for RHI from 2000 through May 2005. Cox also served as a division director for some period of time, but spent less than 20 percent of her time on division director responsibilities. Maresch worked for RHI as a staffing manager in the office team division from January 2004 until July 2005. McCasland worked for RHI as an account executive in its management resources division from October 2000 to January 2002, and again from June 2004 until April 2005. One month before she left her employment with RHI, she was promoted to branch manager. Rossetto worked for RHI as an account executive in the creative group division from March 2002 until September 2003.
The duties and responsibilities of an account executive[2] involved recruiting, interviewing, and evaluating candidates to be placed as temporary employees; selecting and placing candidates on job orders and assisting clients with their call-in business needs; and new business development. In performing those functions, account executives were expected to follow the "recipe" established by corporate headquarters. Account executives were expected to perform the three major functions of their position on a three-week rotating basis broken down into a "sales week" or marketing week, "desk week," and "recruiting week."
During sales week, account executives were expected to make 125 telephone calls or "connects" with clients, conduct approximately 15 client visits, and attend networking events. During desk week, account executives were expected to handle incoming telephone calls and take job orders from clients. During recruiting week, they were expected to interview 15 to 25 potential candidates to determine whether those candidates might be added to RHI's *94 self-described "inventory" of individuals to be placed. The three-week rotation system could be modified to suit the number of account executives working in a particular division at any given time. Account executives were also required to participate in "white board meetings" at least twice a day, during which they would utilize a white board to list their daily goals and chart their progress in achieving those goals.
Each account executive was expected to consider the clients and candidates he or she worked with as his or her "book of business" although the "book" ultimately belonged to RHI; an account executive was also expected to assist his or her teammates. Account executives worked as a team in trying to locate candidates when there was a need for a specific skill set. They did not set policy for RHI and were expected to operate within the policy guidelines that were provided to them.
Account executives were evaluated based on how well they met sales production minimum requirements and the number of hours that were billed to clients for services provided by candidates. A direct sale involved placing a candidate with a client. Account executives did not usually make recommendations to a client regarding how to staff projects. The account executive's job was to fill the orders as they came in.
After placing a candidate, account executives had no role in supervising the candidate in his or her performance of services for the client. If a client desired to terminate a candidate's services, the client would inform the account executive and the account executive would relay the message to the candidate and attempt to provide a replacement candidate. Account executives did not have the authority to hire or fire other account executives and did not supervise administrative support staff in the offices.
RHI's supervising manager's guide refers to RHI as "a sales-driven organization where delivering sales results is an important part of our culture. We take pride in being highly skilled and well-trained sales professionals. Our goal as sales professionals must be to develop long-lasting client relationships versus short-term transactional business."

BACKGROUND

I.

PLEADINGS
Plaintiffs initiated their lawsuit against RHI in March 2006. In the first amended complaint, plaintiffs alleged RHI (1) failed to pay overtime compensation in violation of Labor Code sections 510, subdivision (a), 1194, 201, *95 202, and 203; (2) failed to provide proper meal and rest breaks in violation of Labor Code sections 512 and 226.7 and IWC Wage Order No. 4-2001; (3) failed to maintain and submit itemized wage statements in violation of Labor Code section 226; and (4) engaged in unfair competition in violation of Business and Professions Code section 17200 based on the above referenced Labor Code sections. (All further statutory references are to the Labor Code unless otherwise specified.) Cox, McCasland, and Pellegrino alleged additional claims against RHI for nonpayment of commissions and unfair competition for such nonpayment (Bus. & Prof. Code, § 17200 et seq.). The first amended complaint alleged plaintiffs were employed by RHI as account executives, branch managers, and/or division directors. That complaint further alleged they regularly worked more than eight hours per day and/or 40 hours per week, but were not paid overtime wages or commissions and were not provided meal and rest periods or itemized statements of wages.
RHI filed an answer to the first amended complaint, which contained a general denial and alleged several affirmative defenses. RHI's eighth affirmative defense alleged all of plaintiffs' claims were barred "by a contractual agreement between Plaintiffs and Defendant to limit the time period within which any claims against Defendant may be filed." RHI also alleged, as its sixth affirmative defense, that plaintiffs were exempt from overtime compensation requirements under the Labor Code and IWC Wage Order No. 4-2001[3] because they "were employed in an administrative, executive, professional, and/or relevant sales capacity within the meaning of the applicable wage order(s)."

II.

MOTIONS FOR SUMMARY JUDGMENT AND SUMMARY ADJUDICATION
RHI filed motions for summary judgment against plaintiffs. As to each plaintiff except Pellegrino, RHI argued the alleged claims were barred because each plaintiff failed to file his or her lawsuit within six months of the termination of employment as required by the employment agreement each signed.[4] RHI's motions were also brought on the ground that plaintiffs' wage and hour claims and unfair competition claims failed because plaintiffs were exempt from the laws underlying their claims.
Each plaintiff (except Pellegrino) filed a motion for summary adjudication on the ground the provision of his or her employment agreement shortening *96 the applicable statutes of limitations was unlawful, and all plaintiffs moved for summary adjudication on the ground RHI's exemption affirmative defense failed because they did not meet the requirements for any exemption as a matter of law.
The trial court denied each of RHI's motions for summary judgment. Citing Martinez v. Master Protection Corp. (2004) 118 Cal.App.4th 107 [12 Cal.Rptr.3d 663] (Martinez), the court concluded the employment agreements' provision shortening the applicable statute of limitations for plaintiffs' claims to six months was void and unenforceable because it violated public policy, violated section 219's prohibition against private agreements contravening statutory remedies, and was unconscionable. The trial court, therefore, granted McCasland's, Balici's, Cox's, Rossetto's, and Maresch's motions for summary adjudication as to that issue, but otherwise denied plaintiffs' motions on the ground a triable issue of material fact existed as to whether they were exempt employees.

III.

TRIAL AND MOTION FOR JUDGMENT ON THE EXEMPTION AFFIRMATIVE DEFENSE
Before trial, the court bifurcated plaintiffs' unfair competition claims and ordered that such equitable claims first be tried to the court without a jury. As agreed to by RHI's counsel, the court bifurcated the exemption affirmative defense and tried that issue first. After 17 days of trial, and at the close of RHI's case-in-chief on the exemption affirmative defense, plaintiffs moved for judgment under Code of Civil Procedure section 631.8, arguing they performed a production or sales role in RHI's day-to-day business, but did not have an impact on RHI's policies or general business operations and therefore could not be exempt administrative employees.
The trial court granted plaintiffs' motion. Although the court discussed the merits of the motion, the court made clear that its comments did not constitute a statement of decision. The court further stated that if it chose to add anything to its reasoning, the court would wait until it had a proposed statement of decision that the court could "supplement or modify or change." The record does not contain a statement of decision and does not show that any party had requested one.[5]

*97 IV.

STIPULATION FOR JUDGMENT AS TO DAMAGES, PENALTIES, AND INTEREST
On February 4, 2008, five days after plaintiffs' motion for judgment on the exemption defense was granted, the parties entered into the following stipulation regarding the remaining issues in the litigation:
"WHEREAS the Orange County Superior Court, the Honorable Andrew P. Banks presiding, on January 29, 2008 granted plaintiffs' motion for judgment under Code of Civil Procedure section 631.8 on Defendant Robert Half International, Inc.'s exemption affirmative defense;
"WHEREAS it is stipulated and agreed that, each plaintiff shall be deemed to have established his or her prima facie case on each claim, specifically but without limitation that at some point during their respective employments, plaintiffs each worked more than 8 hours/day and/or 40 hours/week, were not paid overtime for those hours, on occasion did not take meal and/or rest breaks, and did not have their hours of work reported on their pay stub;
"WHEREAS the parties have agreed on the amounts of damages, penalties and interest that are at issue with respect to each plaintiff in this matter;
"WHEREAS the parties have set forth those amounts below and agree that the respective amounts shall be awarded to the respective plaintiffs in the judgment to be entered in plaintiffs' favor upon the court's previously referenced order and the facts to which the parties have stipulated herein;
"WHEREAS defendant reserves its right to appeal the court's ruling granting plaintiffs' motion for judgment and the judgment to be entered by the Court on it, on any and all grounds except the amounts of recovery reflected below and the stipulated facts set forth in the second recital, above;
"WHEREAS plaintiffs and their counsel reserve their rights to submit or move for an award of costs and/or attorneys fees pursuant to applicable post judgment procedures;
"IT IS HEREBY STIPULATED AND AGREED by the parties hereto, through their attorneys of record, that the amounts of damages, interest, and penalties at issue in this matter for each of the respective plaintiffs are as follows:

*98
"Plaintiff Overtime Wages Unpaid Bonuses Totals
 and Premium Pay,
 Inclusive of
 Prejudgment
 Interest, and Pay
 Stub Violation and
 Waiting Time
 Penalties
 _________________
"Nadia Balici $ 28,556.14 -0- $ 28,556.14
"Carolyn Cox $305,701.03 $ 8,750.00 $314,451.03
"Kelli Maresch $ 61,114.18 -0- $ 61,114.18
"Jennifer McCasland $ 76,215.40 $ 6,562.50 $ 82,777.90
"Maria Pellegrino $ 63,259.68 $ 2,187.50 $ 65,447.18
"James Rossetto $ 62,653.58 -0- $ 62,653.58
"TOTALS: $597,500.00 $17,500.00 $615,000.00

"The totals are included above to assure accuracy of the parties' agreement."

V.

JUDGMENT AND APPEAL
Judgment was entered, which stated in pertinent part: "The court bifurcated the plaintiffs' claims under California Business and Professions Code section 17200 and ordered they be tried first to the court sitting without a jury. The court bifurcated the exemption affirmative defense for all plaintiffs and tried the issues presented by that defense without a jury. The court ordered the defense to proceed first because it had the burden of proof on the defense. [¶] The court having ruled against defendant on the exemption affirmative defense, and the parties having stipulated to the elements of plaintiffs' prima facie case and the amounts of plaintiffs' damages and other monetary relief, the court has determined there is nothing further for it or for a jury to determine, and upon (a) the facts stipulated by the parties through their counsel, and (b) the court's order granting plaintiffs' motion for judgment." The trial court ordered judgment in favor of plaintiffs in the amounts set forth in the stipulation.
RHI appealed.

*99 DISCUSSION

I.

THE LIMITATION ON CLAIMS PROVISION IN THE PLAINTIFFS' EMPLOYMENT AGREEMENTS IS UNENFORCEABLE.
RHI argues the trial court erred by denying its motions for summary judgment, and granting Balici's, Cox's, Maresch's, McCasland's, and Rossetto's motions for summary adjudication on the ground the limitation on claims provision contained in plaintiffs' employment agreements was unenforceable. As we will explain, the trial court did not err because plaintiffs' claims were based on unwaivable and fundamental statutory rights, and the provision drastically shortening to six months the time in which an employee might vindicate such rights violates section 219 and public policy, and is thus unenforceable.

A.

Standard of Review
We review orders granting summary judgment or summary adjudication de novo. (Saelzler v. Advanced Group 400 (2001) 25 Cal.4th 763, 767 [107 Cal.Rptr.2d 617, 23 P.3d 1143]; Village Nurseries v. Greenbaum (2002) 101 Cal.App.4th 26, 35 [123 Cal.Rptr.2d 555].) A motion for summary judgment or summary adjudication is properly granted if the moving papers establish there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

B.

Undisputed Facts
The facts pertinent to the enforceability of the limitation on claims provision contained in each of plaintiffs' employment agreements are few and undisputed. Balici, Cox, Maresch, McCasland, and Rossetto each signed an employment agreement which contained the following provision: "18. Limitation on Claims. Employee hereby agrees that no claim against any of the RHI Companies shall be valid if asserted more than six months after Employee's Termination Date, and waives any statute of limitations to the contrary." None of them filed their claims against RHI within six months of *100 the date that his or her employment with RHI ended. RHI's answer to the first amended complaint asserted, as the eighth affirmative defense, the limitation on claims provision in the employment agreements barred their claims.

C.

Plaintiffs' Claims for Violations of Wage and Hour Laws Are Based on Unwaivable and Fundamental Statutory Rights.
Section 219, subdivision (a) provides: "Nothing in this article shall in any way limit or prohibit the payment of wages at more frequent intervals, or in greater amounts, or in full when or before due, but no provision of this article can in any way be contravened or set aside by a private agreement, whether written, oral, or implied." (Italics added.) Section 219 is located within article 1 of division 2, part 1, chapter 1 of the Labor Code.[6] Plaintiffs' claims which alleged RHI failed to pay overtime compensation and commissions, failed to provide rest periods and itemized wage statements, and engaged in unfair competition are based (at least in part) on statutory provisions contained in article 1 of division 2, part 1, chapter 1 of the Labor Code.
The legal authorities, discussed post, further confirm the statutory wage and hour rights at issue in this case are unwaivable and based on strong public policy.

1. Right to Overtime Pay
(1) The first amended complaint alleged RHI failed to pay overtime compensation in violation of sections 201,[7] 202,[8] 203,[9] 510, subdivision (a), and 1194. In Gentry v. Superior Court (2007) 42 Cal.4th 443, 455-456 [64 *101 Cal.Rptr.3d 773, 165 P.3d 556] (Gentry), the California Supreme Court held that the statutory right to receive overtime pay is a matter of public importance and is unwaivable. In Gentry, the Supreme Court stated: "Section 510 provides that nonexempt employees will be paid one and one-half their wages for hours worked in excess of eight per day and 40 per week and twice their wages for work in excess of 12 hours a day or eight hours on the seventh day of work. Section 1194 provides a private right of action to enforce violations of minimum wage and overtime laws. That statute states: `Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit.' [Citation.] By its terms, the rights to the legal minimum wage and legal overtime compensation conferred by the statute are unwaivable. `Labor Code section 1194 confirms "a clear public policy . . . that is specifically directed at the enforcement of California's minimum wage and overtime laws for the benefit of workers."' [Citation.] Although overtime and minimum wage laws may at times be enforced by the Department of Labor Standards Enforcement (DLSE), it is the clear intent of the Legislature in section 1194 that minimum wage and overtime laws should be enforced in part by private action brought by aggrieved employees. [Citation.]" (Ibid., fn. omitted.)
The Gentry court further stated: "The public importance of overtime legislation has been summarized as follows: `An employee's right to wages and overtime compensation clearly have different sources. Straight-time wages (above the minimum wage) are a matter of private contract between the employer and employee. Entitlement to overtime compensation, on the other hand, is mandated by statute and is based on an important public policy.... "The duty to pay overtime wages is a duty imposed by the state; it is not a matter left to the private discretion of the employer. [Citations.] California courts have long recognized [that] wage and hours laws `concern not only the health and welfare of the workers themselves, but also the public health and general welfare.' [Citation.] . . . [O]ne purpose of requiring payment of overtime wages is `"to spread employment throughout the work force by putting financial pressure on the employer ...."' [Citation.] Thus, overtime wages are another example of a public policy fostering society's interest in a stable job market. [Citation.] Furthermore . . . the Legislature's decision to criminalize certain employer conduct reflects a determination [that] the conduct affects a broad public interest . . . . Under Labor Code section 1199 it is a crime for an employer to fail to pay overtime wages as *102 fixed by the Industrial Welfare Commission."' [Citation.] [¶] Moreover, the overtime laws also serve the important public policy goal of protecting employees in a relatively weak bargaining position against `"the evil of `overwork.'"'" (Gentry, supra, 42 Cal.4th at p. 456, italics added.)
The Gentry court held: "[A]t least in some cases, the prohibition of classwide relief would undermine the vindication of the employees' unwaivable statutory rights and would pose a serious obstacle to the enforcement of the state's overtime laws." (Gentry, supra, 42 Cal.4th at p. 450.) The court further held that in determining the enforceability of such class arbitration waivers, a trial court should consider (1) that individual awards in wage and hour cases tend to be modest, (2) that a current employee suing as an individual risks retaliation, and (3) that some individual employees may not sue because they are unaware their legal rights have been violated. (Id. at pp. 457, 459, 461.) The Supreme Court concluded a class arbitration waiver should not be enforced if a trial court concludes, after considering those factors, "that class arbitration would be a significantly more effective way of vindicating the rights of affected employees than individual arbitration." (Id. at p. 450.)

2. Right to Meal and Rest Periods
(2) Citing Gentry, supra, 42 Cal.4th 443, the appellate court in Franco v. Athens Disposal Co., Inc. (2009) 171 Cal.App.4th 1277 [90 Cal.Rptr.3d 539] (Franco) held that meal and rest period rights are also unwaivable. (Franco, supra, at pp. 1290-1292, 1294.) The Franco court stated: "Section 226.7, subdivision (a), requires employers to comply with the meal and rest period provisions of the Wage Order." (Id. at p. 1294.)[10] The court stated: "`[T]he [California] Labor Code provisions at issue, [primarily sections 226.7 and 512,] as well as the wage order, are designed to protect individual employees. Indeed, meal period provisions address some of "the most basic demands of an employee's health and welfare." . . . Moreover, the text of the wage order and the statutory provisions . . . make clear that the right to meal periods is a *103 generally applicable labor standard that is not subject to waiver by agreement. As stated plainly in § 219, the right cannot "in any way be contravened or set aside by a private agreement, whether written, oral or implied."' [Citation.] Thus, to the extent Gentry ... may be limited to unwaivable statutory rights, it applies here because, under section 219, the meal and rest period laws cannot be waived." (Franco, supra, at p. 1294.) After considering the three factors set forth in Gentry, supra, 42 Cal.4th 443, the Franco court held the class arbitration waiver before it was invalid with respect to the alleged violations of meal and rest period laws. (Franco, supra, at p. 1282.)

3. Right to Itemized Wage Statements
(3) In Zavala v. Scott Brothers Dairy, Inc. (2006) 143 Cal.App.4th 585, 596 [49 Cal.Rptr.3d 503], the appellate court held that rights related to wage stub itemization under section 226 were "nonnegotiable, nonwaivable, minimum statutory labor standards."[11] Citing section 219, subdivision (a), the Zavala court stated: "These are `minimum substantive guarantees' [citation], because the Legislature has categorically forbidden the modification of any provision of these laws." (Zavala v. Scott Brothers Dairy, Inc., supra, at p. 596.)
Section 226, subdivision (e) provides an employee may recover actual damages or $50 for each violation of section 226, subdivision (a). Section 226, subdivision (g) provides that an employee may bring an action for injunctive relief to ensure compliance with this section. Section 226.6 criminalizes a knowing and intentional violation of section 226 as a misdemeanor carrying a *104 penalty of a maximum $1,000 fine and/or imprisonment for up to one year. (See Gentry, supra, 42 Cal.4th at p. 456 ["`"the Legislature's decision to criminalize certain employer conduct reflects a determination [that] the conduct affects a broad public interest..."'"].)

4. Right to Payment of Commissions As Wages
Section 201, subdivision (a) provides in part: "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." Section 200, subdivision (a) provides: "`Wages' includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." (Italics added; see Koehl v. Verio, Inc. (2006) 142 Cal.App.4th 1313, 1329 [48 Cal.Rptr.3d 749] ["commission payments can be wages under the express description of section 200 and applicable cases"].)
(4) In Smith v. Superior Court (2006) 39 Cal.4th 77, 82 [45 Cal.Rptr.3d 394, 137 P.3d 218], the California Supreme Court stated: "The public policy in favor of full and prompt payment of an employee's earned wages is fundamental and well established: `"Delay of payment or loss of wages results in deprivation of the necessities of life, suffering inability to meet just obligations to others, and, in many cases may make the wage-earner a charge upon the public."' [Citation.] California has long regarded the timely payment of employee wage claims as indispensable to the public welfare: `It has long been recognized that wages are not ordinary debts, that they may be preferred over other claims, and that, because of the economic position of the average worker and, in particular, his dependence on wages for the necessities of life for himself and his family, it is essential to the public welfare that he receive his pay when it is due. [Citations.] An employer who knows that wages are due, has ability to pay them, and still refuses to pay them, acts against good morals and fair dealing, and necessarily intentionally does an act which prejudices the rights of his employee.' [Citations.] We recently identified sections 201 and 203 as implementing this fundamental public policy regarding prompt wage payment." (Italics added.)
Section 203, subdivision (a) provides in relevant part: "If an employer willfully fails to pay, without abatement or reduction, in accordance with Section[] 201, . . . any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days." Section 203, subdivision (b) provides: "Suit may be filed for these penalties at any time before the expiration of the statute of limitations on an action for the wages from which the penalties arise."

*105 D.

The Limitation on Claims Provision Constitutes an Unlawful Attempt to Restrict Employees' Ability to Enforce Their Unwaivable Statutory Rights.

1. California Law and Rationale on Shortening of Limitations Periods
(5) Under certain circumstances, California law permits parties to agree to a provision shortening the statute of limitations. (Charnay v. Cobert (2006) 145 Cal.App.4th 170, 183 [51 Cal.Rptr.3d 471].) Whether such a provision will be enforced depends not only on the reasonableness of the period fixed (ibid. [period fixed cannot be "`so unreasonable as to show imposition or undue advantage'"]) but on the types of claims and rights affected by such a contractual provision.[12]
In Martinez, supra, 118 Cal.App.4th 107, 111, an employee sued his former employer for Labor Code violations, national origin discrimination, and wrongful termination. The employer moved to enforce an arbitration agreement which not only required that the employee submit all claims to arbitration but also required that all statutory and common law claims covered by the agreement be brought within six months of the date when the claim arose. (Id. at pp. 111, 117.)
The appellate court in Martinez held that the entire arbitration agreement was unenforceable because it was procedurally and substantively unconscionable. (Martinez, supra, 118 Cal.App.4th at p. 111.) As a part of its unconscionability analysis, the court held the provision of the arbitration agreement shortening the applicable statutes of limitations to six months unlawfully restricted the employee's ability to vindicate his civil and statutory rights. (Id. at p. 117.) The court stated: "The arbitration agreement requires the assertion of all statutory and common law claims covered by the agreement within six months of the date when the claim arises. If the party asserting the claim fails to do so, `the claim shall be void and deemed waived *106 even if there is a federal or state statute of limitations which would have given more time to pursue the claim.' [The employee] correctly contends that the provision imposing a vastly shortened statute of limitations constitutes an unlawful attempt by [the employer] to restrict its employees' statutory rights. [¶] The statutes upon which [the employee]'s claims are premised provide significantly longer periods of time than six months within which to assert a claim of violation. Specifically, [the employee]'s claim of national origin discrimination arises out of the FEHA [Fair Employment and Housing Act]. That statute provides that [the employee]'s administrative charge must be filed within one year from the date of the discriminatory act, and that he must file any civil action within one year of the date on which the administrative agency issues a `right to sue' letter. [Citations.] `[A]n arbitration agreement cannot be made to serve as a vehicle for the waiver of statutory rights created by the FEHA.' [Citation.] Similarly, the Labor Code, which provides the bases for [the employee]'s causes of action for unpaid wages and penalties, affords an employee three or four years to assert the claims sued upon here. [Citations.] If there was any doubt, after Armendariz[ v. Foundation Health Psychcare Services, Inc. (2000) 24 Cal.4th 83 [99 Cal.Rptr.2d 745, 6 P.3d 669]], it is clear that `parties agreeing to arbitrate statutory claims must be deemed to "consent to abide by the substantive and remedial provisions of the statute. . . . Otherwise, a party would not be able to fully `"vindicate [his or her] statutory cause of action in the arbitral forum."'"' [Citation.] The shortened limitations period provided by [the employer]'s arbitration agreement is unconscionable and insufficient to protect its employees' right to vindicate their statutory rights." (Id. at pp. 117-118.)
Here, the applicable statutes of limitations for plaintiffs' claims were much longer than the six-month period imposed by the limitation on claims provision. For example, the statute of limitations for plaintiffs' claims seeking the recovery of overtime wages was three years pursuant to Code of Civil Procedure section 338 and the statute of limitations for their unfair competition claims was four years under Business and Professions Code section 17200. (See Gentry, supra, 42 Cal.4th at pp. 470-471.)
(6) We agree with the appellate court in Martinez, supra, 118 Cal.App.4th 107, that the enforcement of a provision in an employment agreement, which seriously truncates the time period in which an employee may assert any claim, unlawfully restricts the employee's ability to vindicate his or her statutory rights. Our conclusion is supported by the Supreme Court's expressed concern in Gentry, supra, 42 Cal.4th 443, discussed ante, that a class arbitration waiver might pose a "serious obstacle to the enforcement of the state's overtime laws" (id. at p. 450) because, among other factors, "some individual employees may not sue because they are unaware that their legal rights have been violated" (id. at p. 461).
*107 The Supreme Court in Gentry, supra, 42 Cal.4th at page 461, explained its concern as follows: "The New Jersey Supreme Court recently emphasized the notification function of class actions in striking down a class arbitration waiver in a consumer contract: `[W]ithout the availability of a class-action mechanism, many consumer-fraud victims may never realize that they may have been wronged. As commentators have noted, "often consumers do not know that a potential defendant's conduct is illegal. When they are being charged an excessive interest rate or a penalty for check bouncing, for example, few know or even sense that their rights are being violated."' [Citation.] Similarly, it may often be the case that the illegal employer conduct escapes the attention of employees. Some workers, particularly immigrants with limited English language skills, may be unfamiliar with the overtime laws. [Citation.] Even English speaking or better educated employees may not be aware of the nuances of overtime laws with their sometimes complex classifications of exempt and nonexempt employees. [Citation.] The likelihood of employee unawareness is even greater when, as alleged in the present case, the employer does not simply fail to pay overtime but affirmatively tells its employees that they are not eligible for overtime. Moreover, some employees, due to the transient nature of their work, may not be in a position to pursue individual litigation against a former employer." (Italics added.)

2. The Provision Shortening the Limitation Period in This Case Is Unenforceable.
Here, RHI classified each plaintiff as an exempt employee and, because of that classification, did not pay overtime wages or comply with other wage and hour statutes. Enforcement of a provision, such as the limitation on claims provision in this case, would result in barring legitimate, unwaivable statutory wage and hour claims asserted by misclassified employees who were unable to discover their employer's classification error and assert appropriate claims within six months of the date their employment ended. We conclude this provision contravenes the vindication of such statutory rights within the meaning of and in violation of section 219 and violates the fundamental public policies, described ante, underlying such rights. In light of our conclusion, we do not reach the trial court's other ground for its ruling on the motions that the provision was also unconscionable.
Citing Davis v. O'Melveny & Myers (9th Cir. 2007) 485 F.3d 1066, 1077-1078 (Davis), Soltani v. Western & Southern Life Ins. Co. (9th Cir. 2001) 258 F.3d 1038, 1040, 1043-1045 (Soltani), and Perez v. Safety-Kleen Sys. (N.D.Cal., June 27, 2007, No. C 05-5338 PJH) 2007 U.S.Dist. Lexis 48308 (Perez), RHI argues in its opening brief: "While no California Court of Appeal squarely has addressed the enforceability of such agreements between *108 employers and employees, two Ninth Circuit cases and a federal district court in California have. Applying California law, all three held that private agreements between an employer and employee shortening to six months from termination of employment the limitations period for filing claims against an employerthe exact agreement at issue hereare enforceable."
As discussed ante, the appellate court in Martinez, supra, 118 Cal.App.4th 107, addressed the unenforceability of such an agreement within the context of its analysis of the overall unconscionability of an employment arbitration agreement. Neither Davis, supra, 485 F.3d 1066 nor Soltani, supra, 258 F.3d 1038 addressed whether a private agreement shortening the applicable statutes of limitations as to an employee's unwaivable statutory wage and hour claims violates California's public policy. Each case solely analyzed the enforceability of such a provision based on whether it might be deemed unconscionable. Neither case cited section 219 or its application.
In Davis, supra, 485 F.3d 1066, 1077-1078, a panel of the Ninth Circuit Court of Appeals held a provision in an employment arbitration agreement, which shortened the applicable statute of limitations to one year after the employee knew or reasonably should have known about the claim, was substantively unconscionable. The court in Davis explained the provision in its case was unconscionable because it "functions to bar a `continuing violations' theory because it specifically bars any claims not brought within a year of when they were first known (or should have been known). Absent equitable tolling (and it is uncertain whether an arbitrator would allow tolling), such `continuing violations' would be barred by the [provision]...." (Id. at p. 1077.) The Davis court distinguished Soltani, supra, 258 F.3d 1038, which had concluded a similar provision was not substantively unconscionable because the contractually modified statute of limitations was triggered by the termination of employment, thereby eliminating any issue with regard to barring claims of continuing violations. (Davis, supra, at p. 1077 ["This type of provision does not raise the concerns about nullifying the `continuing violations' theory, as the employee would during that six-month period still be able to take full advantage of the ability to reach back to the start of the violation."].)
In Soltani, supra, 258 F.3d 1038, 1040, the plaintiffs' complaint "basically contend[ed] that [the insurance company] wrongfully terminated [their] employment in violation of public policy because they refused, as required by [the insurance company], to pay certain premiums for policy holders to prevent policies from lapsing," a requirement they contended was an unfair business practice. A panel of the Ninth Circuit Court of Appeals considered the enforceability of the following provision contained in the insurance agent agreement: "You agree not to commence any action or suit relating to this *109 agreement or your relationship with [the insurance company] more than six months after termination of this Agreement, and to waive any statute of limitation to the contrary." (Id. at p. 1041.) The court stated: "Many California cases have upheld contractual shortening of statutes of limitations in different types of contracts, including employment situations. Cases from other jurisdictions also support affirmance. Appellants have cited no case specifically striking down a contractual provision shortening a limitations period. There certainly are, however, cases striking particular contractual clauses as unconscionable. [Citation.] Appellants, therefore, argue under a more general unconscionability analysis that they were presented with contracts of adhesion, could not negotiate terms, and thus should not be held to the shortened limitations period." (Id. at p. 1042.)
The only California case cited by the Soltani court as an example of such a case upholding the enforceability of a contractual provision shortening the statutes of limitations in an employment case is Beeson v. Schloss (1920) 183 Cal. 618 [192 P. 292]. In Beeson v. Schloss, the Supreme Court held a contractual provision limiting a salesman's right to seek commissions to six months was reasonable. (Beeson v. Schloss, supra, at p. 624.) Beeson v. Schloss, however, predated the wage and hour statutes underlying plaintiffs' claims in this action; section 219, for example, was not enacted until 1937. Beeson v. Schloss also predated the recent California Supreme Court cases, discussed ante, interpreting those statutes. For these reasons, we do not find the basis for Soltani persuasive.
The court in Soltani, supra, 258 F.3d at page 1044, ultimately concluded the six-month contractual limitation provision was not substantively unconscionable under California law. Unlike the Supreme Court in Gentry, supra, 42 Cal.4th 443 and the appellate court in Martinez, supra, 118 Cal.App.4th 107, the Soltani court did not analyze whether the provision in question unlawfully restricted the vindication of unwaivable statutory wage and hour rights in violation of public policy.
Finally, in Perez, supra, 2007 U.S.Dist. Lexis 48308 at pages *7, *12, and *13, the district court, solely relying on Soltani, supra, 258 F.3d 1038, concluded a provision in an employment agreement, requiring an employee to commence a lawsuit relating to his employment no later than six months after the disputed employment action occurred, was valid and enforceable. In Perez, one of the plaintiffs argued section 219 rendered the agreement unenforceable. (Perez, supra, at p. *13.) The Perez court rejected the argument, stating: "The article to which Labor Code § 219 refers includes Labor Code § 226.7, which governs the right to meal and rest periods. The contract [the plaintiff] signed, however, did not `contravene' or `set aside' his right to meal and rest periodsit shortened the time period in which he could *110 bring suit against [the employer]. The statute of limitations for meal and rest period claims is not governed by the Labor Codeit is set by Code of Civil Procedure § 338. [Citation.] Labor Code § 219, therefore, does not invalidate [the plaintiff]'s contract." (Id. at pp. *13-*14.)
We respectfully disagree with this interpretation of the meaning of section 219 and believe it misstates California law. Webster's Third New International Dictionary (2002) at page 496 defines "contravene" as "to go or act contrary to: obstruct the operation of: INFRINGE, DISREGARD." One very effective way to obstruct the operation of the wage and hour statutes is to radically reduce the time period in which employees may assert claims enforcing them. The limitation on claims provision here imposes such a radical reduction by seeking to reduce three- and four-year statutes of limitations to only six months.
(7) Furthermore, as discussed in detail ante, an employer's compliance with statutory wage and hour laws, including payment of overtime and other wages, and the provision of meal and rest periods and itemized wage statements, is not only significant to affected employees, it is a matter of "public importance." (Gentry, supra, 42 Cal.4th at p. 456.) Our interpretation of section 219 is further supported by the maxim of jurisprudence codified at Civil Code section 3513, which provides: "Any one may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement." We cannot interpret section 219 so narrowly as to disarm it against efforts to undermine employees' vindication of unwaivable statutory wage and hour rights.[13]
The trial court correctly concluded the limitation on claims provision was unenforceable.

II.

THE TRIAL COURT DID NOT DENY RHI ANY RIGHT TO A JURY TRIAL.
In its opening brief, RHI contends: "At trial, the court deprived RHI of its right to have a jury resolve factual issues relevant to its exemption defense. It *111 sua sponte severed plaintiffs' Unfair Competition Law claim from their Labor Code claims, tried the exemption defense to the court, and then declared its rejection of the defense to be dispositive of the Labor Code claims as well." As we shall explain in detail, neither the law nor the record supports RHI's contention of error.

A.

Applicable Legal Principles Governing the Order of Proof of Trial and the Conduct of Trials Involving Both Legal and Equitable Claims
Evidence Code section 320 provides: "Except as otherwise provided by law, the court in its discretion shall regulate the order of proof." (See Heppler v. J.M. Peters Co. (1999) 73 Cal.App.4th 1265, 1285 [87 Cal.Rptr.2d 497] ["a court has wide discretion in controlling the manner in which evidence is presented"].)
In Hoopes v. Dolan (2008) 168 Cal.App.4th 146, 155 [85 Cal.Rptr.3d 337], the appellate court provided the following overview on the conduct of a trial involving both legal and equitable claims: "Historically, there were separate law and equity courts. [Citation.] The law courts dealt with ordinary property rights, debts, and trespasses and adjudicated disputes by live testimony before a lay jury. [Citation.] The equity courts dealt with ethical matters and adjudicated disputes by written testimony before a judge. [Citation.] The separate law and equity courts were merged, but the distinction between law and equity remains to this day."
The court in Hoopes v. Dolan, supra, 168 Cal.App.4th at pages 156-157, further explained: "Complications arise when legal and equitable issues (causes of action, requested remedies, or defenses) are asserted in a single lawsuit. The lawsuit is rarely treated as a single unit for purposes of determining the right to a jury trial. [Citations.] In most instances, separate equitable and legal issues are `kept distinct and separate,' with legal issues triable by a jury and equitable issues triable by the court. [Citations.] [¶] The order of trial, in mixed actions with equitable and legal issues, has great significance because the first fact finder may bind the second when determining factual issues common to the equitable and legal issues. [Citation.] It is well established in California jurisprudence that `[t]he court may decide the equitable issues first, and this decision may result in factual and legal findings that effectively dispose of the legal claims.' [Citation.] This district Court of Appeal has observed that the `better practice' is for `the trial court [to] determine the equitable issues before submitting the legal ones to the jury.' [Citation.] The historical reason for this procedure, at least as concerns *112 equitable defenses, is that the same order of trial was observed when there were separate law and equity courts: `If a defendant at law had an equitable defense, he resorted to a bill in equity to enjoin the suit at law until he could make his equitable defense effective by a hearing before the chancellor.' [Citation.] `[T]he practical reason for this procedure is that the trial of the equitable issues may dispense with the legal issues and end the case.' [Citation.] In short, `trial of equitable issues first may promote judicial economy.' [Citation.] [¶] California's preference for the trial of equitable issues before legal issues has produced a number of cases in which bench resolution of equitable issues preceded consideration of legal claims, and curtailed or foreclosed legal issues. [Citation.]"
(8) Quoting from the Supreme Court's decision in Raedeke v. Gibraltar Sav. & Loan Assn., supra, 10 Cal.3d 665, 671, the appellate court in Hoopes v. Dolan, supra, 168 Cal.App.4th at page 157, stated: "`It is well established that, in a case involving both legal and equitable issues, the trial court may proceed to try the equitable issues first, without a jury . . . and that if the court's determination of those issues is also dispositive of the legal issues, nothing further remains to be tried by a jury.'"
The Hoopes v. Dolan court further explained: "`Just as the parties are bound by collateral estoppel where issues are litigated in a prior action, so, too, do issues decided by the court in the equitable phase of the trial become "conclusive on issues actually litigated between the parties."' [Citation.] While the comparison to collateral estoppel is inexact [citation], there are solid policy reasons for giving one fact finder's determinations binding effect in a mixed trial of legal and equitable issues. The rule minimizes inconsistencies, and avoids giving one side two bites of the apple." (Hoopes v. Dolan, supra, 168 Cal.App.4th at p. 158, italics added.)

B.

The Trial Court Elicited Counsel's Input Regarding the Order of Proof at Trial and Solely Determined RHI's Exemption Affirmative Defense Was Without Merit Before the Parties Stipulated to the Remaining Equitable and Legal Issues in the Case.
RHI's portrayal of the court's actions during trial, including the court's alleged deprivation of a jury trial on legal issues, is not complete or accurate. During a pretrial hearing, the court asked the parties for their time estimates for a jury trial and asked whether there were any "nonjury issues, equitable issues" to be resolved; plaintiffs' counsel advised the court of plaintiffs' unfair competition claims. The parties' respective counsel each informed the *113 court that the determination of the unfair competition claims would essentially end the case because the parties would likely settle as to the remaining issues.
The following discussion occurred regarding the order of proof at trial:
"[RHI's counsel]: And, Your Honor, on the legal issues, it is our contention that there is a big legal issue to be decided at the outset of the case, [apropos] the exemption issue. And that is a judicial determination of which duties are administrative duties, and which duties are sales duties. So that that determination of whether the duties are eligible for the exemption or not eligible for the exemption has been decided before we actually begin the case.
"The Court: Okay. What does that do to the [Business and Professions Code section] 17200 claim?
"[RHI's counsel]: Well, that's up to the jury.
"The Court: Well, there's no jury in a 17200 claim.
"[RHI's counsel]: It's [a] common issue. So the jury gets to
"The Court: Would decide the exemption
"[RHI's counsel]: Sure.
"The Court:part?
"[RHI's counsel]: Would decide theno, it wouldn't decide those issues. Your Honor decides, I think, the way it's set up, whether the duty itself is a potentially nonexempt duty or not potentially nonexempt. Whether it's administrative duty or whether it's sales.
"The Court: Uh-huh.
"[RHI's counsel]: And once that decision is made, then the jury decides the quantitative issue. Whether they spent 50 percent o[r] more of their time on the potentially nonexempt duties versus the potentially ineligible duties.
"The Court: But that issue arises within the 17200 claim.
"[RHI's counsel]: Certainly it does.
*114 "The Court: Well, why is there a jury? There's no right to a jury to a 17200 claim.
"[RHI's counsel]: But on common issues there's a 7th Amendment right to a trial by jury on the common issues.
"The Court: When you say, `common issues,' II'm going to need to get some more informationnot now, we can come back to itbecause, generally speaking, the law in California is, on an equitable cause of action, the court decides it. And any facts it decides it may carry over into any remaining nonequitable causes of action are binding on the jury.
"[Plaintiffs' counsel]: Are not binding?
"The Court: Are binding.
"[RHI's counsel]: I think it's the reverse.
"The Court: No, I can [as]sure you, it is as I've said it. It's a shock to many lawyers, but it's black letter law, be it in Witkin or the California Judges[] Bench[book], that in nonjury causes of actions, court, if it severs and tries them firstwhich is the preferred, recommended waythe court to the extent there are any issuesor issues or factswe should talk about factsto the extent there are any facts determined by the court in the equitable cause of action that carry over into the legal jury trials, the jury is bound by the court's findings.
"And so that issue may come into play. That's my recollection. We'll obviously all look at it very carefully, but that's, as I said, it's black letter law, and
"[RHI's counsel]: I know it's the flip in the federal courts under [the] 7th Amendment.
"The Court: Ahh, and therein lies that difference, states are laboratories of democracy.
"[RHI's counsel]: The states are governed by the 14th Amendment, not the 7th Amendment. So, I understand this.
"The Court: So we'll look at it, but that issueokay, in the more global sensemeans that perhaps we would try the 17200 claim. It may require pretty much all of the evidence that would come in under the other cases as well. But my comfort level is fairly high that it's okay to do that because *115 what I just told you in terms of that principle. And if there was anything left that would be tried to the jury, they would hear that cause of action with whatever facts I've determined.
"So we'll go back and double check to make sure I didn't miss a change in the law.
"[RHI's counsel]: Actually, Your Honor, that mightthat could easilyif Your Honor's correct, and I'm accepting that you are-that then that could streamline the trial exponentially."
After plaintiffs' counsel asked questions about the trial court's proposed procedure, the discussion between the court and counsel continued, with the trial court referencing another case in its courtroom, as follows:
"The Court: The trial that we're in now, we tried the defendant's equitable defenses first for weeks, because everyone thought that wouldhey, let's do that. And because the plaintiff[s] said, if they're going to win on that, I don't want to spend all the time, you know, putting on the rest of the case with the jury and all, so we did it for weeks. And the defendants did not prevail. So then we empaneled a jury, then we started worrying about jury instructions.
"[Plaintiffs' counsel]: Okay.
"The Court: The same type of an approach of doing the equitable court trial matters first and resolving those. And then seeing what's left and how we're going to deal with it, approach it that way.
"[RHI's counsel]: Actually, Your Honor, that's more or less one of our motions. We've moved to bifurcate the trial of the affirmative defense and try it first.
"The Court: Uh-huh.
"[RHI's counsel]: So the only difference would be whether it's tried to you or tried to the jury.
"The Court: What's the affirmative defense?
"[RHI's counsel]: Exemption.
"The Court: And that would apply to the 17200 claim?
"[RHI's counsel]: Absolutely.
*116 "The Court: Okay. So it might get tried to me.
"Okay. Well, have a seat. Give some thought [t]o what I've said, and we'll try to figure out what we're going to do in terms of timing."
The record does not show any further discussion on those issues of the order of proof at trial. Shortly thereafter, the parties presented their opening arguments to the court on the applicability of the administrative exemption to plaintiffs. After RHI completed its case-in-chief on the exemption affirmative defense, the trial court granted plaintiffs' motion for judgment. After providing an explanation of its decision, the court stated to counsel, "[n]ow, what we're going to do is we're going to recess till Monday" and "[y]ou're going to make your best efforts to see whether agreement can be reached as to the remaining issues such that stipulations could be entered and a judgment entered reflecting the stipulations and the court's rulings. [¶] To the extent you get all of that done, wonderful. It's wrapped up ready to be done. To the extent you get a portion thereof and then we have to hear testimony . . . . And if you can't resolve . . . that issue, that there would be further testimony that the court will take on those issues that are unresolved. [¶] And if you don't resolve any of it, then Monday be prepared to try every remaining issue in the case." On Monday, February 4, 2008, the parties entered a stipulation that resolved all of the remaining issues in the case and judgment was entered accordingly.

C.

RHI Was Not Denied Any Right to a Jury Trial.
After proposing to try the equitable unfair competition claims to the court first, as is the preferred course of action as discussed ante in Hoopes v. Dolan, supra, 168 Cal.App.4th at page 157, the trial court advised the parties to think about it and confirm the binding effect of the court's factual findings made in determining the equitable issues on the trial on plaintiffs' legal claims. The record does not show RHI thereafter asserted any objection to the court's proposal. Thus, RHI's contention that "[a]lthough RHI posted jury fees and demanded a jury trial on plaintiffs' Labor Code claims, the trial court sua sponte denied the request" and "proceeded to try the issues of fact encompassed by RHI's affirmative defense to itself under the umbrella of plaintiffs' [Business and Professions Code section] 17200 claim" is far from a complete or accurate characterization of what actually happened in the trial court.
RHI's statement that the court "ultimately held there was no need for a jury to be empanelled on the Labor Code claims because the court's *117 resolution of the affirmative defense on the [Business and Professions Code section] 17200 claim left nothing for a jury to decide with respect to liability" similarly misses the mark by a wide margin. The court found, as part of the trial on the unfair competition claims, that plaintiffs were not exempt employees under the administrative exemption pursuant to IWC Wage Order No. 4-2001, and accordingly granted plaintiffs' motion for judgment. The court then invited the parties to consider what issues remained undecided and further invited them to consider resolving any outstanding issues by stipulation. Such outstanding issues necessarily included how much, if anything, RHI owed each plaintiff for failing to pay overtime compensation and commissions, and for failing to provide rest and meal periods and itemized wage statements.
The court expressly stated, however, that the parties should be ready to resume trying all remaining issues the following Monday. The record does not contain any further discussion on this subject between the trial court and counsel or in any appellate briefs addressing this issue. Instead of resuming the trial, the parties stipulated to the remaining issues in the case, whether equitable or legal, and further stipulated to specific amounts of "damages, interest, and penalties" due each plaintiff, upon which stipulation, judgment was entered.
RHI argues Walton v. Walton (1995) 31 Cal.App.4th 277 [36 Cal.Rptr.2d 901] "demonstrates the trial court's error" by standing for the proposition that where legal and equitable remedies are sought that are not mutually exclusive, all such claims must be tried and the right to a jury trial cannot be defeated by severance of the equitable claim. In Walton v. Walton, supra, 31 Cal.App.4th at page 292, the defendant argued, "the right to a jury trial cannot be defeated by joining equitable claims with legal claims and then severing the equitable claim for nonjury trial. [The defendant] argue[d] severance was improper because [Code of Civil Procedure] section 1048 . . . expressly provides that severance may not be employed to deprive a party of the constitutional right to a jury trial." (Citation omitted.) The appellate court stated, "[a] plaintiff may plead inconsistent, mutually exclusive remedies, such as breach of contract and specific performance, in the same complaint. [Citations.] Such alternative pleading is not a `joinder' of causes of action, because the `seeking of different kinds of relief does not establish different causes of action.' [Citation.] The statutory provisions for severance and separate trial are not limited to separate trial of a cause of action but also authorize separate trial of any issue." (Ibid.)
The court in Walton v. Walton, supra, 31 Cal.App.4th at page 293, further stated: "`It is well established that, in a case involving both legal and equitable issues, the trial court may proceed to try the equitable issues first, *118 without a jury . . . , and that if the court's determination of those issues is also dispositive of the legal issues, nothing further remains to be tried by a jury. [Citations.]' [Citation.] [¶] In arguing that joinder of equitable with legal claims cannot deprive a party of the right to a jury trial, defendant ignores the distinction that this case involved mutually exclusive remedies. She cites inapposite cases . . . where one party raised cumulative legal and equitable remedies that were not mutually exclusive [citations]. [¶] In such cases, all claimslegal and equitablemust be tried, and the right to jury trial cannot be defeated by severance of the equitable claim. But where mutually exclusive remedies are pled, there need not be a trial on both the legal and the equitable remedy. Resolution of one renders the other moot." (See American Motorists Ins. Co. v. Superior Court (1998) 68 Cal.App.4th 864, 872 [80 Cal.Rptr.2d 621] [same].)
Here, the remedies available under the unfair competition claims and the Labor Code violations are cumulativenot mutually exclusive. (Bus. & Prof. Code, § 17205 ["Unless otherwise expressly provided, the remedies or penalties provided by this chapter are cumulative to each other and to the remedies or penalties available under all other laws of this state."]; see Stop Youth Addiction, Inc. v. Lucky Stores, Inc. (1998) 17 Cal.4th 553, 565-566 [71 Cal.Rptr.2d 731, 950 P.2d 1086] [through Bus. & Prof. Code, § 17205, "the Legislature has clearly stated its intent that the remedies and penalties under the UCL [unfair competition law] be cumulative to other remedies and penalties"].) But, nothing in Walton v. Walton, supra, 31 Cal.App.4th 277 prohibits what the trial court did here, particularly in light of the parties' conduct in proceeding to try the exemption affirmative defense to the court without objection and in stipulating to all remaining issues after the court made its findings on that defense.
In this case, once the trial court had decided the unfair competition case and in the absence of the stipulation, a jury would need to have been empanelled to determine any remaining legal issues including damages. (Code Civ. Proc., § 1048, subd. (b) [court may order separate trial of any separate issue].)[14] RHI's argument that it was entitled to a jury trial on the outstanding legal issues is both premature (because the trial did not get that farthe court was not even finished determining whether a violation of the unfair competition law had occurred) and moot (because the parties stipulated to all remaining issues, including the legal remedy of "damages" that would be awarded to plaintiffs). (See Connell v. Bowes (1942) 19 Cal.2d 870, 872 *119 [123 P.2d 456] [agreeing that a trial court may properly hold a bench trial on equitable issues first and thereafter deny a jury trial on legal issues if there are no remaining issues for the jury].) The trial court never stated its intention of denying a jury trial on any remaining legal issues; nor does the record reflect that RHI's counsel labored under a contrary understanding. Indeed, the trial court stressed that if the parties could not reach a stipulation on remaining issues, the trial would resume.
We find no error.[15]

III.

THE ADMINISTRATIVE EXEMPTION WAS INAPPLICBLE TO PLAINTIFFS.
The trial court granted plaintiffs' motion for judgment under Code of Civil Procedure section 631.8, following the completion of RHI's case-in-chief as to its exemption affirmative defense on the ground none of the plaintiffs qualified for the administrative exemption under IWC Wage Order No. 4-2001. As discussed in detail post, we conclude substantial evidence supports the trial court's implied finding the first criterion of the exemption was not satisfied because plaintiffs' work as account executives did not directly relate to management policies or general business operations of RHI or of RHI's customers.

A.

Standard of Review
"We apply the substantial evidence standard of review to a judgment entered under Code of Civil Procedure section 631.8, reviewing the record in the light most favorable to the judgment and making all reasonable inferences in favor of the prevailing party . . . . [Citation.] We will not reverse the trial court's order granting the motion if its findings are supported by substantial evidence, even if other evidence in the record conflicts. [Citation.]" (Combs v. Skyriver Communications, Inc. (2008) 159 Cal.App.4th 1242, 1263 [72 Cal.Rptr.3d 171] (Combs).)
*120 No party requested a statement of decision under Code Civ. Proc., § 631.8, subd. (a) and none was prepared.[16] (See Tusher v. Gabrielsen (1998) 68 Cal.App.4th 131, 140 [80 Cal.Rptr.2d 126] [despite the mandatory language in Code Civ. Proc., § 631.8, subd. (a) that the trial court "shall make a statement of decision" when granting a motion for judgment, it is not required unless timely requested by a party].) Thus, under the doctrine of implied findings, we infer the trial court made any and all findings necessary to support the judgment, and review the implied findings under the substantial evidence standard. (In re Marriage of Arceneaux (1990) 51 Cal.3d 1130, 1133-1134 [275 Cal.Rptr. 797, 800 P.2d 1227]; Fladeboe v. American Isuzu Motors Inc. (2007) 150 Cal.App.4th 42, 61-62 [58 Cal.Rptr.3d 225].)

B.

The Administrative Exemption Under IWC Wage Order No. 4-2001
(9) As indicated in Gentry, supra, 42 Cal.4th at page 455, section 510, subdivision (a), provides, "[a]ny work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek . . . shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee." As explained in Eicher v. Advanced Business Integrators, Inc. (2007) 151 Cal.App.4th 1363, 1371-1372 [61 Cal.Rptr.3d 114], the Industrial Welfare Commission, however, "`may establish exemptions from the requirement that an overtime rate of compensation be paid pursuant to Sections 510 . . . for executive, administrative, and professional employees, provided that the employee is primarily engaged in the duties that meet the test of the exemption, customarily and regularly exercises discretion and independent judgment in performing those duties, and earns a monthly salary equivalent to no less than two times the state minimum wage for full-time employment.' (§ 515, subd. (a).) [¶] Pursuant to the authority granted by section 515 to establish exemptions to the overtime pay provision of section 510, the Industrial Welfare Commission issued wage order No. 4-2001, applicable to professional, technical, clerical, mechanical, and similar occupations. Included in title 8 of the California Code of Regulations, as section 11040, the wage order provides a five-part test to determine whether the administrative employee exemption applies. The employee must (1) perform `office or non-manual work directly related to management policies or *121 general business operations' of the employer or its customers, (2) `customarily and regularly exercise[] discretion and independent judgment,' (3) `perform[] under only general supervision work along specialized or technical lines requiring special training' or `execute[] under only general supervision special assignments and tasks,' (4) be engaged in the activities meeting the test for the exemption at least 50 percent of the time, and (5) earn twice the state's minimum wage.[17] Stated in the conjunctive, each of the five elements must be satisfied to find the employee exempt as an administrative employee."[18] (Fn. omitted.)
(10) In Ramirez v. Yosemite Water Co. (1999) 20 Cal.4th 785, 794-795 [85 Cal.Rptr.2d 844, 978 P.2d 2], the California Supreme Court explained: "In interpreting the scope of an exemption from the state's overtime laws, we begin by reviewing certain basic principles. First, `past decisions . . . teach that in light of the remedial nature of the legislative enactments authorizing the regulation of wages, hours and working conditions for the protection and *122 benefit of employees, the statutory provisions are to be liberally construed with an eye to promoting such protection.' [Citation.] Thus, under California law, exemptions from statutory mandatory overtime provisions are narrowly construed. [Citations.] Moreover, the assertion of an exemption from the overtime laws is considered to be an affirmative defense, and therefore the employer bears the burden of proving the employee's exemption. [Citations.]" (See also Nordquist v. McGraw-Hill Broadcasting Co. (1995) 32 Cal.App.4th 555, 562 [38 Cal.Rptr.2d 221] ["Exemptions are narrowly construed against the employer and their application is limited to those employees plainly and unmistakably within their terms."].)
(11) Unlike its predecessors, IWC Wage Order No. 4-2001, which became effective on January 1, 2001, expressly incorporates certain regulations promulgated under the Fair Labor Standards Act of 1938 (29 U.S.C. § 201 et seq.), as those regulations were effective the date IWC Wage Order No. 4-2001 was issued. (Combs, supra, 159 Cal.App.4th at p. 1254.) Specifically, IWC Wage Order No. 4-2001, as contained in California Code of Regulations, title 8, section 11040, subdivision (1)(A)(2)(f) provides in part: "The activities constituting exempt work and non-exempt work shall be construed in the same manner as such terms are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: 29 [Code of Federal Regulations parts] 541.201-205, 541.207-208, 541.210, and 541.215." Furthermore, "[t]he definition of the administrative exemption provided in IWC wage order No. 4-2001 closely parallels the federal regulatory definition of the same exemption. Under the [Fair Labor Standards Act], `any employee employed in a bona fide executive, administrative, or professional capacity' is exempt from the statute's minimum wage and maximum hour requirements, and thus from the overtime compensation requirements." (Combs, supra, at p. 1255.)

C.

Substantial Evidence Supported the Implied Finding Plaintiffs Did Not Qualify for the Administrative Exemption Under IWC Wage Order No. 4-2001.
As discussed ante, in order for the administrative exemption to have applied to each plaintiff, RHI would have had to prove that all five criteria set forth in IWC Wage Order No. 4-2001 were satisfied. Plaintiffs conceded the fifth criterion (minimum salary requirement) had been satisfied as to each of them. Applying the doctrine of implied findings, we review the record to determine whether substantial evidence supported the finding that any one of the remaining four criteria was not satisfied. We conclude substantial evidence supported the finding the first criterion was not satisfied.
*123 The first criterion for the administrative exemption is that the employee performs "office or non-manual work directly related to management policies or general business operations of his/her employer or his employer's customers." (Cal. Code Regs., tit. 8, § 11040, subd. 1(A)(2)(a)(I).) The parties do not dispute that plaintiffs engaged in "office or non-manual work" within the meaning of IWC Wage Order No. 4-2001. We therefore turn to the issue whether substantial evidence showed plaintiffs did not perform work "directly related to management policies or general business operations" of RHI or its customers.
In making this determination, we observe that IWC Wage Order No. 4-2001 expressly incorporates the 2000 version of certain federal regulations promulgated under the Fair Labor Standards Act of 1938. Among those regulations is 29 Code of Federal Regulations part 541.205(a) (2009) which states as to the first criterion of the administrative exemption: "The phrase `directly related to management policies or general business operations of his employer or his employer's customers' describes those types of activities relating to the administrative operations of a business as distinguished from `production' or, in a retail or service establishment, `sales' work. In addition to describing the types of activities, the phrase limits the exemption to persons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers."
Here, substantial evidence showed plaintiffs' duties as account executives for RHI were not directly related to management policies because they instead constituted sales work. The evidence presented at trial included the following: (1) at RHI, a direct sale occurred when a candidate was placed with a client; (2) account executives were trained in sales and evaluated on how well they met or exceeded minimum sales production numbers; (3) account executives were primarily responsible for selling the services of RHI's temporary employees to clients; (4) when the account executives were not either soliciting potential clients for sales or placing orders for clients, they were recruiting more candidates for RHI's "inventory," an activity which consumed about 30 percent of their time; (5) account executives had no role in supervising the temporary employees after they were placed and no responsibility for the administrative support staff in the account executives' offices; (6) account executives did not form policy but followed the "recipe," including the three-week rotation system in performing their duties as required by headquarters; and (7) corporate headquarters included a human resources department, marketing department, and legal department designed to support the account executives' functionto focus on making sales.
RHI argues in its petition for rehearing that the trial court and this court erred in determining plaintiffs were not exempt by applying an incorrect legal *124 standard and failing to analyze the exemption's fourth criterion, namely, whether plaintiffs spent more than 50 percent of their time engaged in exempt duties as discussed in Ramirez v. Yosemite Water Co., supra, 20 Cal.4th 785. RHI's arguments are without merit.
Before ruling on the motion for judgment, the trial court carefully considered the evidence, weighed the credibility of the trial witnesses, noting it "found many, if not all, of the witnesses on [RHI]'s side to suffer serious credibility issues," and applied the correct legal principles in accordance with Ramirez v. Yosemite Water Co., supra, 20 Cal.4th 785 and Eicher v. Advanced Business Integrators, Inc., supra, 151 Cal.App.4th 1363. In Eicher v. Advanced Business Integrators, Inc., supra, 151 Cal.App.4th at page 1372, the trial court concluded the defendant employer failed to carry its burden of establishing the administrative exemption because it did not prove the first criterion of the five-part test; the court did not consider the other criteria. The appellate court affirmed, holding the exemption did not apply based on the failure of proof of the first criterion, stating the plaintiff "was an employee who engaged in the core day-to-day business of [the defendant]. He had no personal effect on the policy or general business operations of [the defendant] or its customers." (Id. at p. 1375.)
Here, as in Eicher v. Advanced Business Integrators, Inc., supra, 151 Cal.App.4th at page 1375, the trial court found RHI did not carry its burden of proving the first criterion of the exemption that plaintiffs performed work directly related to management policies or general business operations of RHI or its customers. Substantial evidence supports the trial court's findings.
Our conclusion is consistent with California's Department of Industrial Relations, Division of Labor Standards Enforcement Chief Counsel Miles E. Locker, opinion letter No. 1999.07.26, Applicability of the Administrative Exemption to Recruiters of Temporary Workers (July 26, 1999) [as of Jan. 28, 2010] (Opinion Letter No. 1999.07.26). Opinion Letter No. 1999.07.26 addressed the application of the same version of 29 Code of Federal Regulations part 541.205 (2000) in effect when IWC Wage Order No. 4-2001 took effect. Opinion Letter No. 1999.07.26 addressed whether recruiters who worked in a recruiting company qualified for the administrative exemption.[19] Opinion Letter No. 1999.07.26 described the recruiter position at issue as follows: "You state that recruiting positions with this company are considered entry *125 level positions. Once hired, recruiters are provided with training by the company. In general, two recruiters are assigned to a sales consultant who provides assignments to recruiters. Recruiters locate and hire temporary workers for clients of the recruiting company, gather information on potential temporary workers, which information is then input[t]ed into a computer data base, occasionally meet the temporary workers at the job site to confirm attendance, and as needed, deliver paychecks to the temporary workers at their job sites." (Opn. Letter No. 1999.07.26, p. 1.)
Opinion Letter No. 1999.07.26 contained the following analysis and conclusion: "The principal business of the recruiting company as described in your letter is to provide temporary workers on an as-needed basis for clients. Recruiters locate and secure the services of temporary workers on behalf of the recruiting company's clients. This is precisely the core function of a recru[i]ting company's business, in that the product or service it provides to its cus[to]mers is the recruitment of temporary workers. Consequently, the recruiter's duties fall within the purview of production work that is not directly related to policy making or decisions pertaining to general business operations. Based on the facts provided, there is no basis to conclude that the recruiters are exempt employees under the administrative exemption pursuant to federal or state law." (Opn. Letter No. 1999.07.26, p. 3.)
For these reasons, we conclude the trial court's implied findings were amply supported by substantial evidence.

DISPOSITION
The judgment is affirmed. Respondents shall recover costs on appeal.
Rylaarsdam, Acting P. J., and Aronson, J., concurred.
NOTES
[1] The facts contained in this section are based on evidence presented at trial.
[2] The parties agree the terms "account executive," "account manager," and "staffing manager" all refer to the same position in different divisions of RHI. We will use the term "account executive" throughout this opinion for clarity.
[3] California Code of Regulations, title 8, section 11040.
[4] Although RHI filed a motion for summary judgment against Pellegrino, it was not based on the ground the limitation on claims provision barred her claims because she had filed her lawsuit prior to six months after the termination of her employment with RHI.
[5] Plaintiffs' counsel stated to the trial court that the parties had waived a statement of decision. The record does not provide any further information on why a statement of decision was not prepared.
[6] Article 1 of division 2, part 1, chapter 1 of the Labor Code encompasses sections 200 through 243.
[7] Section 201, subdivision (a) provides in part: "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." The term "wages" is defined in section 200, subdivision (a), as follows: "`Wages' includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." (Italics added.)
[8] Section 202, subdivision (a) provides in part: "If an employee not having a written contract for a definite period quits his or her employment, his or her wages shall become due and payable not later than 72 hours thereafter, unless the employee has given 72 hours previous notice of his or her intention to quit, in which case the employee is entitled to his or her wages at the time of quitting."
[9] Section 203, subdivision (a) provides in part: "If an employer willfully fails to pay . . . any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."
[10] IWC Wage Order No. 4-2001 provides in relevant part: "No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes, except that when a work period of not more than six (6) hours will complete the day's work the meal period may be waived by mutual consent of the employer and the employee." (Cal. Code Regs., tit. 8, § 11040, subd. 11(A).) IWC Wage Order No. 4-2001 provides: "Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3 1/2) hours. Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages." (Cal. Code Regs., tit. 8, § 11040, subd. 12(A).)
[11] Section 226, subdivision (a) provides: "Every employer shall, semimonthly or at the time of each payment of wages, furnish each of his or her employees, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately when wages are paid by personal check or cash, an accurate itemized statement in writing showing (1) gross wages earned, (2) total hours worked by the employee, except for any employee whose compensation is solely based on a salary and who is exempt from payment of overtime under subdivision (a) of Section 515 or any applicable order of the Industrial Welfare Commission, (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis, (4) all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one item, (5) net wages earned, (6) the inclusive dates of the period for which the employee is paid, (7) the name of the employee and his or her social security number, except that by January 1, 2008, only the last four digits of his or her social security number or an employee identification number other than a social security number may be shown on the itemized statement, (8) the name and address of the legal entity that is the employer, and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee. The deductions made from payments of wages shall be recorded in ink or other indelible form, properly dated, showing the month, day, and year, and a copy of the statement or a record of the deductions shall be kept on file by the employer for at least three years at the place of employment or at a central location within the State of California."
[12] For example, in Moreno v. Sanchez (2003) 106 Cal.App.4th 1415, 1430 [131 Cal.Rptr.2d 684], the appellate court stated: "[A] contractually shortened limitations period has never been recognized outside the context of straightforward transactions in which the triggering event for either a breach of a contract or for the accrual of a right is immediate and obvious. Moreover, no decision upholding the validity of a contractually shortened limitation period has done so in the context of an action against a professional or skilled expert where breach of a duty is more difficult to detect. Instead, most reported decisions upholding shortened periods involve straightforward commercial contracts plus the unambiguous breaches or accrual of rights under those contracts."
[13] In a letter dated June 30, 2009, RHI informed this court that it was relying on the then recent appellate court decision in Sonic-Calabasas A, Inc. v. Moreno (2009) 174 Cal.App.4th 546 [94 Cal.Rptr.3d 544], review granted September 9, 2009, S174475, for its holding that an employee's waiver of the right to a Berman hearing (§ 98) does not impose a "`significant obstacle to the vindication of statutory rights'" and that a "`Berman waiver'" does not per se violate public policy. On September 9, 2009, however, the Supreme Court granted review in that case. (Cal. Rules of Court, rules 8.1105(e)(1), 8.1115(a).)
[14] Code of Civil Procedure section 1048, subdivision (b) provides: "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of . . . any separate issue or of any number of causes of action or issues, preserving the right of trial by jury required by the Constitution or a statute of this state or of the United States."
[15] In its reply brief, RHI cites three California appellate court opinions that have not been certified for publication in support of its argument it was denied the right to a jury trial. RHI's citations to these unpublished opinions violated rule 8.1115(a) of the California Rules of Court, which states: "[A]n opinion of a California Court of Appeal or superior court appellate division that is not certified for publication or ordered published must not be cited or relied on by a court or a party in any other action."
[16] At the time the trial court granted the motion for judgment, the court stated, "[s]o if I choose to add anything to all of this by way of additional comments, I'll wait till I have a statement of decision to sign and can supplement or modify or change it. But I won't be preparing the first draft. The prevailing party on these issues will, and that is, at this point, the plaintiff[s] on that issue." At the conclusion of the court's comments, plaintiffs' counsel said that he thought the parties had agreed to waive the statement of decision.
[17] Here, plaintiffs conceded the earnings requirement had been satisfied.
[18] IWC Wage Order No. 4-2001 defines the administrative exemption as follows:

"A person employed in an administrative capacity means any employee:
"(a) Whose duties and responsibilities involve either:
"(I) The performance of office or non-manual work directly related to management policies or general business operations of his/her employer or his employer's customers; or
"(II) The performance of functions in the administration of a school system, or educational establishment or institution, or of a department or subdivision thereof, in work directly related to the academic instruction or training carried on therein; and
"(b) Who customarily and regularly exercises discretion and independent judgment; and
"(c) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity (as such terms are defined for purposes of this section); or
"(d) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; or
"(e) Who executes under only general supervision special assignments and tasks; and
"(f) Who is primarily engaged in duties that meet the test of the exemption. The activities constituting exempt work and non-exempt work shall be construed in the same manner as such terms are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: 29 C.F.R. [Code of Federal Regulations] Sections 541.201-205, 541.207-208, 541.210, and 541.215. Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions. The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement.
"(g) Such employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in California Labor Code Section 515[, subdivision ](c) as 40 hours per week." (Cal. Code Regs., tit. 8, § 11040, subd. 1(A)(2).)
IWC Wage Order No. 4-2001 defines the term "primarily," as that word is used in California Code of Regulations, title 8, section 11040, subdivision 1(A)(2)(f), as meaning "more than one-half the employee's work time." (Cal. Code Regs., tit. 8, § 11040, subd. 2(N).)
[19] An opinion letter issued by the Division of Labor Standards Enforcement has no binding effect on this court. (Conley v. Pacific Gas & Electric Co. (2005) 131 Cal.App.4th 260, 270 [31 Cal.Rptr.3d 719] [Division of Labor Standards Enforcement opinion letters "are properly considered by the courts, and may be entitled to some weight, but they do not have the force of law and are not controlling on us"].)